IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| **ANTHONY JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:14-cv-02511-STA-dkv** |
| | ) | |
| **FEDERAL EXPRESS** | ) | |
| **CORPORATION, RICKY** | ) | |
| **L. CARTER AND PATRICK** | ) | |
| **ELAM,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants Federal Express Corporation, Ricky L. Carter, and Patrick Elam's Motion for Summary Judgment (ECF No. 51) filed on July 22, 2015. Plaintiff Anthony Johnson has responded in opposition to the Motion, and Defendants have filed a reply brief. Defendants' Rule 56 Motion is now ripe for determination. For the reasons set forth below, Defendants' Motion is **GRANTED**.

## BACKGROUND

Plaintiff asserts claims of race discrimination and hostile work environment against Defendants pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 as well as a claim of retaliation and disparate impact under Title VII and defamation under Tennessee common law.[1] Defendants now seek summary judgment on each of Plaintiff's claims for relief.

---

[1] Defendants seek summary judgment on Plaintiff's claim for defamation in their opening brief, and Plaintiff has conceded the claim in his response brief. In light of Plaintiff's

Defendants have prepared a statement of undisputed facts as required by Local Rule 56.1(a), to which Plaintiff has responded. For his part Plaintiff has asserted that additional facts are not in dispute, and Defendants have responded to Plaintiff's statement of additional facts. For purposes of summary judgment, the Court finds that the following material facts are not genuinely in dispute.

## I. FedEx Policy and Internal Procedures

Federal Express Corporation ("FedEx"), an express transportation and delivery company, is an equal opportunity employer and maintains policies prohibiting discrimination, harassment, and retaliation. (Defs.' Statement of Undisputed Fact ¶ 1.) FedEx encourages employees to report all allegations of discrimination or harassment to management or the human resources department through FedEx's internal EEO complaint procedure and specifically advises employees in its policy that retaliation is prohibited. (*Id.* ¶ 2.) In addition to its internal complaint procedure, FedEx also offers a separate internal grievance procedure known as the Guaranteed Fair Treatment Procedure ("GFTP"). (*Id.* ¶ 3.) The GFTP process allows employees to dispute the fairness of disciplinary actions or related employment decisions such as terminations through a three step process that involves: (1) management review, (2) officer review, and (3) review by an appeals board. (*Id.*) FedEx's discrimination, harassment, and retaliation policies, along with FedEx's internal complaint procedures, are included in the FedEx Employee Handbook, in the FedEx People Manual, and are maintained on FedEx's intranet which employees can access in their workplace. (*Id.* ¶ 4.) Plaintiff acknowledges receiving an Employee Handbook containing these policies as well as separate copies of FedEx's Anti-Harassment and Acceptable Conduct policies as recently as March 2011. (*Id.* ¶ 5.)

concession, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's claim for defamation.

Due to the nature of FedEx's time-sensitive business, FedEx maintains and strictly enforces an attendance policy which requires employees to report to work punctually. (*Id.* ¶ 6.)[2] FedEx also maintains an Acceptable Conduct policy which provides that "[f]alsification of Company documents or records, including, but not limited to, business reports, delivery records and time cards" and "leadership failure of a member of management" "may result in severe disciplinary action up to and including termination." (*Id.* ¶ 7.) At the time Plaintiff first applied for employment with FedEx, he executed an employment agreement, which contained terms and conditions of employment. (*Id.* ¶ 8.) Specifically, the employment agreement contained a clear and unambiguous provision stating that if Plaintiff wished to bring legal action against FedEx, he is required to do so "within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first." (*Id.*) Plaintiff concedes that he read the employment agreement and understood its terms before signing it. (*Id.* ¶ 9.) Plaintiff was not pressured into signing the agreement, he had time to review it, and he had the opportunity to ask questions. (*Id.* ¶ 10.)

## II. Plaintiff's Position as Operations Manager

After serving in various capacities at FedEx, Plaintiff assumed the role of Operations Manager working on the second floor of the Small Package Sort System building (known as the "SPSS" building) at FedEx's Memphis Hub approximately two and a half years prior to his termination. (*Id.* ¶ 12.) The second floor of the SPSS building is responsible for inducting and placing small packages into bags, printing and attaching consolidated tracking number tags to the bags, and sending the bags to the first floor. (*Id.* ¶ 13.) The first floor then loads the bags into one of several transportation containers and sends them to appropriate planes and trucks for

---

[2] Plaintiff disputes Defendants' claim that the attendance policy was strictly enforced. The Court addresses Plaintiff's contention below.

delivery throughout the world. (*Id.*) This entire process is referred to as the "sort" in the SPSS building. (*Id.*)

Anticipated package volume based on engineering projections determines when the sort process begins each day. (*Id.* ¶ 14.) Timing is critical. (*Id.*) When the sort begins, there is just enough time to process the packages and get them onto the airplanes or into trucks in order to meet delivery commitment times. (*Id.*) If Inductor employees on the second floor of the SPSS building are tardy, the entire sort process will be "tremendously" affected. (*Id.* ¶ 15.) Packages will back up and may not make it to the planes and trucks on time, which will result in service failures and a cost to FedEx under its money back guarantee policy. (*Id.*) For this reason, attendance and punctuality are critical to the success of FedEx's time-sensitive business. (*Id.* ¶ 16.)

Plaintiff acknowledges that an important function of his job as Operations Manager was to hold all employees reporting to him accountable for attendance and punctuality problems. (*Id.* ¶ 17.) Between May 1, 2012 and mid-April 2013, Plaintiff reported directly to Defendant Ricky Carter, a senior manager. (*Id.* ¶ 18.) Carter in turn reported to Tina Adams, a managing director, until Cheri Theil assumed the managing director position in April 2013. (*Id.*) In mid-April 2013, the senior manager over the first floor SPSS operation retired, and Theil directed Carter to move down to the first floor and act as senior manager for that operation. (*Id.* ¶ 19.) Carter's move left his former position as senior manager for the second floor vacant.

Due to a corporate voluntary buy-out program taking place at the time, the vacant senior manager position on the second floor could not be immediately filled. (*Id.* ¶ 20.) Tim Wertner, the vice-president over the night-side sort at the Memphis Hub, asked Defendant Patrick Elam, at Theil's request, to act as senior manager over the second floor SPSS operation on a temporary

basis.  (*Id.* ¶ 21.)   Elam is African-American.  (*Id.* ¶ 22.)   At that time, Elam was also the senior manager for Operational Review Partnership, a group within the Memphis Hub formed to assist underperforming areas with productivity issues.  (*Id.* ¶ 23.)   According to Defendants, Elam was a logical choice to temporarily cover in the SPSS building, and particularly the second floor, as the floor continued to struggle with productivity issues.  (*Id.* ¶ 24.)   Elam acted as senior manager over the second floor SPSS operation from mid-April 2013 through the end of May 2013 when FedEx was able to post the position.  (*Id.* ¶ 25.)

### III. Timekeeping and Punctuality in the Hub

NETtime is the scheduling and timekeeping system utilized primarily by operations managers in the Memphis Hub.  (*Id.* ¶ 26.)   If an employee clocks in for work later than their scheduled start time on a particular day, NETtime generates a notification referred to as an "action required exception," or just an "exception."  (*Id.* ¶ 27.)   When a manager receives notification of an exception, he has two options.  (*Id.* ¶ 28.)   A window pops up on the computer that will allow him to check a box indicating that the employee should be counted tardy or to check a second box indicating that the employee is not late.  (*Id.*)   If the second box is checked, the NETtime system automatically adjusts the employee's scheduled start time to reflect the actual clock-in time so that the employee will appear to have arrived at work on time in the system.  (*Id.*)   The operations manager is then required to type a comment into the system explaining why the employee should not be counted late.  (*Id.*)   Operations managers are permitted to make exceptions for valid reasons.  (*Id.* ¶ 29.)

A simple review of NETtime audit trail reports alone will not reveal whether the exception made was valid or not.  (*Id.* ¶ 30.)   Investigation into what actually occurred is required.  (*Id.*)   In addition to serving as a scheduling and timekeeping tool, the NETtime system

is also used to control employees' access to the Memphis Hub facility. (*Id.* ¶ 31.) An employee cannot enter the Hub facility more than one hour before their scheduled start time in the NETtime system. (*Id.*) Plaintiff understood the NETtime system "very well" given that he attended AT&A training, which is synonymous with NETtime training, in 2007 and again in 2011 with Paul Zoccola, a management facilitator. (*Id.* ¶ 32.) AT&A training covers the exception process managers are required to follow in NETtime when an employee clocks in late as well as the concept of falsification, which is entering inaccurate information into NETtime. (*Id.* ¶ 33.)

After assuming his role of covering senior manager on the second floor of SPSS, Elam began to investigate the cause of the operation's productivity failures. (*Id.* ¶ 34.) Initially, he believed that the cause was a staffing issue created by a failure of the operations managers to schedule enough inductors to fill all of the positions at the beginning of the sort. (*Id.*) Consequently, at the conclusion of the Friday night sort on April 26, 2013, Elam met with the operations managers on the second floor to discuss staffing and instructed them to collectively ensure that 120 inductors were scheduled to begin working at the start of each sort. (*Id.* ¶ 35.) Plaintiff responds that he was on vacation from April 21, 2013, through "about" April 28, 2013. (Pl.'s Resp. to Statement of Undisputed Facts ¶ 35, ECF No. 60-1.)

## IV. Plaintiff's Termination

On Monday, April 29, 2013, Elam noticed on control room monitors located throughout the SPSS building that certain inductor positions were still not filled at the start of the sort. (Defs.' Statement of Undisputed Fact ¶ 36.)[3] Elam began walking the floor to physically count

---

[3] Plaintiff disputes several of the facts surrounding Elam's investigation. For the sake of clarity, the Court will discuss Defendants' version of events first and then take up Plaintiff's version of events separately below.

the employees present, but by the time he came back around, the empty positions had been filled. (*Id.* ¶ 37.) This led Elam to suspect that the productivity problems were actually tied to employee punctuality problems and not scheduling. (*Id.*) To investigate his suspicion, Elam logged into the NETtime system and, at a random glance, noticed odd employee clock-in times such as 23:02 and 23:07. (*Id.* ¶ 38.) This raised a red flag for Elam as employee start times are always in five minute increments. (*Id.*) Elam then asked one of the ORP Managers to run an audit trail from NETtime for all of the second floor managers for the days, Friday, April 26, Sunday, April 28, and Monday, April 29, which covered the three days since Elam last discussed staffing with the operations managers. (*Id.* ¶ 39.) After reviewing the NETtime audit trail report, Elam discovered that five of the managers had entered exceptions on these three days reflecting a change in the employees' scheduled start times: Plaintiff Anthony Johnson, Leslie Morgan-Cox, Rickey Hobson, Steven Caldwell and Kristi Flowers. (*Id.* ¶ 40.)

Elam questioned each of the five operations managers about his or her exceptions and requested statements from them. (*Id.* ¶ 41.) According to Defendants, Flowers had a valid explanation for the one exception noted in her NETtime audit trail report. (*Id.* ¶ 42.) Flowers changed the scheduled start time for one employee because that employee needed to be able to enter the Hub facility more than one hour before his or her scheduled start time to prepare for and attend an interview. (*Id.*) There was no attendance or punctuality issue with the employee. (*Id.*) The four remaining managers, including Plaintiff, were placed on paid suspension on April 30, 2013, pending further investigation as they could not provide valid explanations. (*Id.* ¶ 43.) Plaintiff's audit trail revealed that on Sunday, April 28, 2013, he had six exceptions, and on Monday, April 29, he had one. (*Id.* ¶ 44.)

In a May 3, 2013, statement provided by Plaintiff, Plaintiff explained that on April 28, 2013, he received a call from the main screening facility on Democrat Road reporting that several SPSS employees could not get through. (*Id.* ¶ 45.) When Plaintiff arrived to pick up the employees, he simply yelled for all SPSS employees and three identified themselves. (*Id.* ¶ 46.) Plaintiff concedes that he did not know who these three employees were, they did not report to him, he did not ask them why they were stuck in screening, and he did not check to see whether they were actually scheduled to work that day and thus had permission to be on the property before allowing them access to the Hub. (*Id.*) Later that afternoon, Plaintiff began a review of NETtime not only for his employees but for all the second floor SPSS employees working that day. (*Id.* ¶ 47.) Plaintiff received notification through the NETtime system that six employees clocked-in late after their scheduled start times. (*Id.*) Plaintiff had no idea who these six employees were or whether they were the employees Plaintiff had picked up at screening, and Plaintiff never spoke to any of the six employees to find out why he or she was late to work. (*Id.* ¶ 48.) Despite all this, Plaintiff clicked the box in NETtime indicating that these six employees should not be counted tardy, which caused their scheduled start times to be altered to match their clock-in times. (*Id.*) In the comment section, Plaintiff typed "EE couldn't get into screening – mgr picked up" as his explanation for each change. (*Id.* ¶ 49.) Plaintiff admits that he had no idea whether these comments were true when he entered them. (*Id.*)[4]

---

[4] Plaintiff disputes Defendants' claims about his own statement by asserting that he always administered NETtime in an appropriate way and according to instructions he received from Carter. Pl.'s Statement of Add'l Facts ¶ 55, 56. Plaintiff's response is noted for the record. However, the Court finds that nothing in the materials cited actually calls into question the contents of Plaintiff's own written statement describing how Plaintiff picked up the employees on April 28, 2013. Therefore, the Court finds that Defendants' fact claims are undisputed for purposes of summary judgment.

Elam established during his investigation that Plaintiff's type-written comments in the NETtime system were false. (*Id.* ¶ 50.) As part of his investigation, Elam interviewed five of the six employees for whom Plaintiff had entered exceptions on April 28, 2012. (*Id.*) The sixth employee was on vacation. (*Id.*) All five employees reported to Elam that they were not delayed in screening and they were not picked up by management. (*Id.* ¶ 51.) By reviewing access control reports, Elam also confirmed that four of the six employees entered through a different screening facility on April 28, 2012, than the one where Plaintiff had picked up employees and that two of the six employees were already tardy by the time they first entered the screening facility. (*Id.* ¶ 52.)

As part of his investigation, Elam also reviewed Plaintiff's training records and contacted Zoccola to confirm that Plaintiff attended AT&A training. (*Id.* ¶ 53.) Elam then reviewed Plaintiff's employment and disciplinary history and discovered that Plaintiff had been counseled or disciplined in the past for failing to hold employees accountable for attendance and punctuality and for leadership failure. (*Id.* ¶ 54.) One of the other operations managers under investigation for entering exceptions in NETtime for tardy employees, Leslie Morgan-Cox, told Elam that Ricky Carter previously instructed her not to count employees late. (*Id.* ¶ 55.) When Elam questioned Carter about this, Carter denied ever giving such an instruction. (*Id.*) For his part, Plaintiff admits that Ricky Carter never told him not to hold employees accountable for attendance-related issues and never told him to falsify a document. (*Id.* ¶ 56.)[5] Plaintiff knew that falsification of company documents was against company policy and could result in termination upon a first offense. (*Id.* ¶ 58.) Plaintiff had previously received two memos from

---

[5] Defendants add that Ricky Carter's administrative assistant testified that Carter emphasized in meetings the importance of punctuality. Defs.' Statement of Undisputed Fact ¶ 57.

Carter, one in December 2012 and the other on February 4, 2013, in which Carter instructed his employees to "never misrepresent or falsify any document . . ." (*Id.* ¶ 59.)

Elam discussed his findings with Theil, Don McDougall in human resources, and an attorney in FedEx's legal department. (*Id.* ¶ 60.) All concurred that Johnson's conduct warranted termination. (*Id.*) Theil additionally requested that Carter run an audit trail in NETtime for a random sample of operations managers on the first and third floors of the SPSS building for three days to determine if adjusting scheduled start times was a common practice. (*Id.* ¶ 61.) The sample revealed that the practice was not common. (*Id.*) Elam terminated Plaintiff's employment on May 22, 2013 for leadership failure arising out of his falsification of the timekeeping entries and failure to hold employees accountable for punctuality in violation of FedEx's Acceptable Conduct policy. (*Id.* ¶ 62.) Ricky Carter did not participate in the termination decision. (*Id.* ¶ 63.)[6] FedEx terminated three other operations managers Leslie Morgan-Cox, Steven Caldwell, and Rickey Hobson on the same day for the same reasons. (*Id.* ¶ 64.)[7] FedEx has not filled Plaintiff's position number since his termination. (*Id.* ¶ 67.) Two of the next three individuals hired as operations managers on the second floor of the SPSS building following Plaintiff's termination were African American, and the third identifies herself with two or more races. (*Id.*)

---

[6] Plaintiff disputes this fact by citing comments Carter made just before Elam took over as senior manager on the second floor of the SPSS. Pl.'s Statement of Add'l Fact ¶ 48. The Court holds that any remarks by Carter that Elam would "straighten out" the operations managers in the area does not show that Carter had a role in the decision to terminate Plaintiff. The Court finds this fact to be undisputed then for purposes of summary judgment.

[7] Defendants also assert that Elam believed Caldwell to be Caucasian, though Caldwell indicated on an employment form that he is Asian. Defs.' Statement of Undisputed Fact ¶ 65. Plaintiff himself identified Caldwell's race as "White" in his GFT complaint and in his submission to the EEOC. *Id.* ¶ 66.

Plaintiff has filed his own Statement of Additional Facts, explaining his view of the timekeeping issue and his termination. Plaintiff asserts that SSPS had staffing and scheduling issues, which resulted in inadequate numbers of employees for certain shifts. (Pl.'s Statement of Add'l Fact ¶¶ 10-11.)[8] The proof shows that Ricky Carter instructed operations managers not to count employees late under certain circumstances, such as during inclement weather or when employees were working an extra shift beyond their normal five-day work week just to assist with understaffing and to get overtime. (*Id.* ¶ 12-14.) Carter instructed one manager, Rickey Hobson, not to "mark them late" because "we needed them." (*Id.* ¶ 13.) When Patrick Elam replaced Ricky Carter as the senior manager, he instructed the operations managers to continue "business as usual." (*Id.* ¶ 30.)[9] Defendants respond that there is no evidence that the tardy employees whom Plaintiff clocked in as present on time on April 28, 2013, fit into any of these categories. (Defs.' Resp. to Pl.'s Add'l Facts ¶ 14, ECF No. 65-1.)

## V. The Guaranteed Fair Treatment Process

[8] Plaintiff actually goes further and suggests that management needed employees to work when they were not actually scheduled. The Court finds that the evidence cited by Plaintiff does not actually support this contention. For their part Defendants argue that these facts are not only unsupported but immaterial. "A fact is material for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). In this case Plaintiff was terminated for reporting employees as arriving on time for work when they were, in fact, tardy. Therefore, the Court holds that evidence of prior instances where Carter instructed senior managers to show that tardy employees were on time is material to Plaintiff's claims.

[9] Plaintiff adds that Elam never issued any written expectations to the operations managers working under his supervision or directed them to carry out their responsibilities in any way different from the way they had under Ricky Carter. Pl.'s Add'l Facts ¶ 31. Plaintiff also asserts that FedEx, Ricky Carter, and Patrick Elam never advised Plaintiff that he was misuing NETtime or misreporting employee attendance. *Id.* ¶ 32. As with many of Plaintiff's assertions, however, this claim is not supported in the record cited by Plaintiff. Therefore, the Court does not consider this statement in deciding Defendants' Motion.

Plaintiff appealed his termination through FedEx's Guaranteed Fair Treatment Process. (Defs.' Statement of Undisputed Fact ¶ 68.) At step I of the process, Cheri Theil upheld the termination decision based on her review of pertinent information submitted by management, information submitted by Plaintiff, communication with Ricky Carter, and a face-to-face meeting with Plaintiff, Patrick Elam and McDougall. (*Id.*)[10] At step II of the process, Tim Wertner, the vice-president over the night-side sort at the Memphis Hub, made the decision to uphold Plaintiff's termination after he reviewed all information related to the decision provided by Plaintiff, management, human resources, and FedEx's legal department. (*Id.* ¶ 69.) Wertner also consulted with human resources manager Myron Donald, who is African American, who concurred with the termination decision as well. (*Id.*)[11]

At step III of the process, Sharon Mitchum was assigned as the HR compliance advisor responsible for compiling all of the information considered at steps I and II into a packet for the Appeals Board members and providing an additional recommendation on behalf of HR compliance, a division within HR, to the Appeals Board if necessary. (*Id.* ¶ 70.) While HR compliance did not dispute that a policy violation occurred, it disagreed that termination was the correct action and recommended that Plaintiff be reinstated with a performance reminder. (*Id.* ¶ 71.) Reginald Owens, Sr., who is African American, served as vice-president of human resources and administrator of the Appeals Board. (*Id.* ¶ 72.) As such, he had the authority to

---

[10] Plaintiff objects that Theil never interviewed witnesses he identified to her, implying that this omission made her investigation incomplete. Pl.'s Statement of Add'l Fact ¶ 39. The Court addresses this and other fact claims Plaintiff makes about the GFTP below.

[11] Plaintiff contends that Wertner could not specifically say at his deposition what steps he took to review Plaintiff's termination. *Id.* ¶ 40. However, the record cited by Plaintiff does not support his claim and actually states the opposite, as Wertner explains what he reviewed and to whom he spoke. The Court finds then that Plaintiff's characterization of Wertner's testimony is incomplete and somewhat misleading.

send a GFTP appeal back down to management for further review after the step II decision if there was an internal dispute. (*Id.*) In light of HR compliance's disagreement with the form of discipline imposed, Owens requested that Elam run a NETtime audit trail for a broader, random sample of managers throughout the Hub. (*Id.* ¶ 73.)[12] Based on the information obtained from the audit trail, Owens concluded that the practice was not widespread and allowed the matter to proceed to the Appeals Board. (*Id.*) The Appeals Board, which included FedEx's chief human resources officer, who is African American, voted unanimously to uphold the decision to terminate Plaintiff's employment. (*Id.* ¶ 74.)

The parties agree that it was not the role of HR compliance to determine whether Plaintiff's termination was discriminatory or retaliatory. (*Id.* ¶ 75.) Plaintiff did go on to file an internal EEO asserting claims of discrimination and retaliation following his termination. (*Id.* ¶ 76.) Managing Director Cedric Taylor and HR advisor Vanessa Boykin, both of whom are African-American, separately investigated Plaintiff's claims of discrimination and retaliation and could not confirm his claims. (*Id.*) Finally, Plaintiff filed an external charge of discrimination with the EEOC on January 21, 2014, for which he was issued a dismissal on April 7, 2014. (*Id.* ¶ 77.)

## VI. Additional Facts Supporting Plaintiff's Claims of Hostile Work Environment and Retaliation

Defendants cite a series of other facts relevant to Plaintiff's claims of hostile work environment and retaliation. In May 2012 one year before his termination, Plaintiff filed a workplace violence complaint against another manager, J. Russell, after Russell allegedly "came

_____

[12] Plaintiff adds that Patrick Elam ran the report and met with Owens at his home to discuss the matter. Pl.'s Statement of Add'l Fact ¶ 45. Plaintiff also notes that the report with the broader audit trail is no longer in existence and therefore was not provided in discovery. *Id.* These facts are noted, though Plaintiff never explains in his briefing why these facts are material to the issues presented at summary judgment.

over the desk" at Plaintiff. (*Id.* ¶ 78.) Although Russell is white, Plaintiff concedes that he did not believe Russell treated him differently because of Plaintiff's race, and Plaintiff never claimed that Russell's actions were race-based. (*Id.* ¶ 79.) And on May 31, 2012, Johnson received a performance reminder from Ricky Carter for failing to communicate information to a covering manager regarding an employee who did not call-in or show up for work for five days after bereavement leave. (*Id.* ¶ 80.)

In December 2012, Ricky Carter issued performance reminders to Plaintiff and several other managers, including two who are white, for sort delays, flights delays, and other performance failures that occurred within the SPSS operation on the night of December 7, 2012. (*Id.* ¶ 81.) Subsequent to a GFTP appeal, the reminders were modified to a record of counseling in FedEx's Online Compliment and Counseling ("OLCC") system. (*Id.*) OLCCs are not considered discipline. (*Id.*) Plaintiff also attempted to appeal his performance reminder through an internal EEO, alleging that he was being harassed. (*Id.* ¶ 82.) Plaintiff's complaint did not indicate that he was being harassed based on his race or any other protected characteristic, and Plaintiff now admits that his race was not a factor in the alleged harassment. (*Id.*) On January 2, 2013, Plaintiff challenged the issuance of the performance reminder by filing an external charge with the EEOC alleging age discrimination. (*Id.* ¶ 83.) The EEOC issued a dismissal within one week on the basis that he did not claim a civil rights violation. (*Id.*) Also, in early April 2013, Plaintiff received an OLCC for not following the chain of command when he needed help with a "work related issue." (*Id.* ¶ 84.)

At the time he made the decision to terminate Plaintiff's employment, Elam had no knowledge of Plaintiff's May 2012 workplace violence complaint, December 2012 internal EEO,

or January 2013 external EEOC. (*Id.* ¶ 85.)[13] Plaintiff never heard Ricky Carter, Patrick Elam, Cheri Theil, or any member of FedEx HR make a racially derogatory comment. (*Id.* ¶ 86.)

Plaintiff has asserted a number of additional facts in support of his claims, including his claims for hostile work environment and retaliation. According to the testimony of Percy Hunter, Ricky Carter's administrative assistance, Hunter perceived that Carter became frustrated when he presented an idea to his senior managers and the senior managers informed him that the idea had been tried before and failed. (Pl.'s Statement of Add'l Fact ¶ 16.)[14] Hunter observed that Carter grew frustrated only when employees who are African-American questioned his ideas. (*Id.* ¶ 17.)[15] With respect to his December 2012 performance reminder issued by Carter, Plaintiff states that the reminder should have been removed from his personnel file following the outcome of the GFTP process but never was. (*Id.* ¶ 21.) With respect to his April 2013 performance reminder issued by Carter, Plaintiff states that Carter issued the reminder after

---

[13] Plaintiff attempts to dispute this claim by asserting that Ricky Carter experienced difficulty managing his subordinates who were African American. Pl.'s Statement of Add'l Fact ¶¶ 46, 48. Plaintiff also cites testimony that rumors existed at FedEx that Elam was reassigned to supervise Carter's area strictly for the purpose of terminating Plaintiff and other employees. *Id.* ¶ 47. The Court discusses the admissibility of the rumor evidence further below.

[14] According to Plaintiff, Hunter observed Carter react this way with African American subordinates. The testimony Plaintiff cites does not state this at all, though the testimony cited in Plaintiff's next statement of fact can be read to support the claim.

[15] Again citing Hunter's testimony, Plaintiff asserts that Carter had a personal problem with employees who filed EEO complaints against him. Pl.'s Statement of Add'l Fact ¶ 18. But the testimony cited by Plaintiff does not actually support the contention. Therefore, the Court declines to consider it.

And in his next statement of additional fact, Plaintiff claims that Carter targeted an employee to get him fired. *Id.* ¶ 19. Hunter's testimony, however, is very vague on this point. Hunter could only state that Carter reported an employee, who was not under his supervision, for sitting down at his desk during a sort. Hunter had no knowledge of what happened to the other employee or whether he received discipline. Hunter Dep. 41:4-19. The Court is hard-pressed to see how this vague testimony that Carter perhaps targeted an unidentified employee is somehow relevant to Plaintiff's claims of discrimination.

Plaintiff reported another operations manager for smoking in the ladies' restroom. (*Id.* ¶ 23.) As grounds for disciplining Plaintiff, Carter stated that Plaintiff had failed to follow the chain of command; Plaintiff also claims that Carter called him a "troublemaker" during their meeting about the incident. (*Id.*) Finally, Plaintiff cites deposition testimony from Rickey Hobson where Hobson stated Ricky Carter remarked that "his hands were tied" with his subordinates in late December 2012 or January 2013, a comment Plaintiff characterizes as a reference to EEO charges against Carter. (*Id.* ¶ 24.)[16] Percy Hunter testified that Carter once said to him that another subordinate Leslie Morgan-Cox filed an EEO against Carter because of Plaintiff. (*Id.* ¶ 49.) According to Hunter, Carter would specifically ask him about whether Plaintiff and Morgan-Cox had completed and turned in reports as he instructed. (*Id.*)

## VII. The Parties' Arguments

Defendants seek judgment as a matter of law on all of Plaintiff's claims against them. First, Defendants argues that Plaintiff's § 1981 claims are time barred. As part of his employment agreement with FedEx, Plaintiff agreed to a six-month statute of limitations on any claim he might have in the future against FedEx. Although Plaintiff was fired on May 22, 2013, Plaintiff did not file suit against FedEx until July 1, 2014. As such, the Court should hold that the § 1981 claims were filed out of time.

Second, even if the Court reaches the merits of Plaintiff's § 1981 claims, the claims fail for the same reasons that Plaintiff's Title VII claims for race discrimination fail. The Court should only consider events that occurred within 300 days of Plaintiff filing his charge with the EEOC, meaning events that took place on or after March 27, 2013. Plaintiff has no direct

---

[16] Plaintiff has cited additional evidence about honors he received as a FedEx employee and discipline Ricky Carter received for his own leadership failures. Id. ¶¶ 2, 3, 28. The Court

evidence of discrimination and so must establish the prima facie elements of his claim with indirect evidence. But in this case Plaintiff cannot prove that he was replaced by someone outside of his protected class or that Defendants treated similarly situated non-protected employees more favorably. The only possible comparator, Kristi Flowers, was also investigated for entering an exception into the NETtime system for an employee but Elam concluded her actions were justified in that instance. Unlike Plaintiff, Flowers did not change multiple employees' start times to cover up tardiness and therefore did not falsify a document in violation of FedEx policy. Defendants are entitled to summary judgment on the race discrimination claims for this reason alone. Even if Plaintiff could prove the elements of his prima facie case, Defendants have a legitimate nondiscriminatory reason for terminating his employment, and Plaintiff cannot show that Defendants' reason is pretextual. Plaintiff also cannot overcome the fact that FedEx's GFTP process allowed for several layers of review and included more than one African-American in the decision review process. At the conclusion of the GFTP process, Plaintiff's termination was upheld.

Third, Plaintiff cannot prove his claim for hostile work environment. Plaintiff relies on a series of discrete incidents, but none of them implicate treatment based on his race. Plaintiff's complaints amount to no more than typical workplace conflict and disagreement. Plaintiff has not shown that he was ever physically threatened or humiliated. Other acts Plaintiff cites in support of this claim affected more than one employee and employees of more than one race, for example, Kristi Flowers' smoking in the ladies' restroom. Defendants contend that none of this evidence is sufficient to make out a claim for hostile work environment.

---

notes this proof for the record but finds that it is simply not relevant to Plaintiff's claims at summary judgment.

Fourth, Defendants argue that Plaintiff cannot prove his retaliation claim. Plaintiff has no evidence to establish a causal connection between his EEO filings and any adverse action Defendants took against him. There is no evidence Carter or Elam had knowledge of Plaintiff's prior EEO activity. None of the acts Carter allegedly took against Plaintiff after he filed his December 2012 EEO can constitute materially adverse actions to support a retaliation claim. Carter issued Plaintiff one formal discipline and verbally addressed two other situations in the four months between Plaintiff's EEO filing and Carter's reassignment to another area. With respect to Elam, Defendants argue that Elam simply had no knowledge of Plaintiff's prior protected activity. Without this proof, Plaintiff cannot establish his retaliation claim. Even if Plaintiff could make out a prima facie case of retaliation, he has no proof of pretext. Therefore, Defendants argue Plaintiff's retaliation claim fails.

Likewise, Plaintiff has failed to adduce evidence in support of his disparate impact claim. Plaintiff must show that management's decision to audit only three days worth of entries in the NETtime system constitutes an employment policy or practice. Defendants contend that this was a one-time, discretionary act, and not a policy or practice. Furthermore, Plaintiff has not shown that the "policy" has a statistically disproportionate impact on minority employees. At best, Plaintiff has shown that in this instance FedEx terminated minority employees following an investigation into the timekeeping practices in Plaintiff's area. Even if this proof made out a disparate impact claim, Plaintiff cannot prove that Defendants' legitimate nondiscriminatory reason for terminating him was pretext. Finally, Defendants argue that Plaintiff lacks clear and convincing proof of malice, fraud, or intent to support his request for punitive damages.

Plaintiff has responded in opposition to Defendants' Rule 56 Motion. Plaintiff argues that genuine issues of material fact remain, which preclude judgment as a matter of law in favor

of Defendants.  Factually, Plaintiff contends that FedEx cannot show that it has ever terminated a white employee for engaging in the same kind of conduct, even though white managers entered exceptions for tardy employees in the NETtime system.  Plaintiff places great emphasis on the conclusions reached by HR compliance during its review of his termination as part of the GFTP process.  Specifically, HR compliance noted that changing time entries appeared to be a common practice and that Plaintiff and other managers were simply acting in the normal course by entering exceptions for tardy employees.  Although HR compliance questioned the thoroughness of Elam's investigation, the Appeals Board apparently ignored the concerns raised by HR compliance.  The fact that HR compliance disagreed with Plaintiff's termination and FedEx management terminated Plaintiff anyway creates a triable issue for a jury to decide.

Plaintiff also argues that the HR compliance report raises a genuine issue about whether similarly situated employees engaged in similar conduct but received more favorable treatment.  In this instance, FedEx terminated Plaintiff and three other minority employees.  Plaintiff argues then that FedEx has no legitimate nondiscriminatory reason for discharging only minority managers for falsifying time entries.  Furthermore, FedEx has not explained why Ricky Carter, who had his own history of performance issues in the workplace, did not receive any discipline for his failure to supervise Plaintiff and the other discharged operations managers.

As for Defendants' legal arguments, Plaintiff responds that the Court should not enforce the six-month limitations period in his employment agreement.  Plaintiff argues that it is unclear when the six-month period begins to run because it is not clear when his termination became final.  While Plaintiff was terminated in May 2013, he exercised his right under the GFTP process to seek review of the termination decision.  Plaintiff further argues that the employment

agreement lacks consideration. And even if the agreement's six-month limitations period is valid, the Court should not apply it to Plaintiff's claims against Carter and Elam.

With respect to his race discrimination claim, Plaintiff argues that genuine issues remain for trial. As an evidentiary matter, Plaintiff contends that the Court should not limit its analysis to 300-day period leading up to the filing of his EEOC charge. Among other facts, the Court should consider the fact that his December 2012 performance reminder should have been removed from his personnel file. As for the merits of the claim, Plaintiff argues that Percy Hunter's testimony about Ricky Carter becoming frustrated with his African-American subordinates and commenting that Patrick Elam would straighten them out constitutes direct evidence of racial animus. Plaintiff also argues that he can prove his claim with circumstantial evidence of discrimination. Plaintiff contends that in addition to his termination, the fact that Carter called him a "troublemaker" and advised Leslie Morgan-Cox to avoid Plaintiff also constitute adverse employment actions. Plaintiff further cites Carter's failure to remove the December 2012 performance reminder from his personnel file as an adverse action.

Next, Plaintiff argues that he can prove that Defendants treated similarly situated, non-protected employees more favorably. Reiterating his characterization of the record, Plaintiff contends that FedEx cannot prove that it has disciplined any white employees for engaging in the same kind of conduct or explain why only minority managers were terminated in this instance. Importantly, Plaintiff states that white employees made changes in NETtime but were not terminated, though Plaintiff has not identified who the employees are or the circumstances surrounding their alteration of time entries in NETtime. Plaintiff again cites the report prepared by HR compliance as part of the GFTP process, including its criticism of Elam's finding that

Kristi Flowers had not engaged in similar conduct and overall criticism of the investigation's thoroughness.

Plaintiff goes on to argue that Defendants have no legitimate, nondiscriminatory reason to support the decision to terminate Plaintiff, for many of the same reasons Plaintiff has already discussed in the context of the similarly situated analysis. FedEx cannot explain why it terminated only minority managers and why it failed to discipline white managers for engaging in essentially the same kind of conduct. Plaintiff argues that the Court should find that FedEx has not carried its burden at this stage of the analysis. Assuming the Court reaches the issue of pretext, Plaintiff argues that Defendants' proffered reasons for terminating him were pretextual. According to Plaintiff, the HR compliance report itself shows that genuine issues exist about management's decision to terminate him. Plaintiff further argues that African-Americans participating in the review process were simply acting as Defendants' cats paws. The evidence shows that Ricky Carter was insecure in dealing with his African-American subordinates like Plaintiff and referred to Plaintiff as a "troublemaker." Plaintiff argues that Carter's move to another floor of the Hub set in motion a plan to have Patrick Elam remove Plaintiff. The fact that management did not thoroughly investigate the timekeeping issue also constitutes evidence of pretext. Therefore, Defendants are not entitled to summary judgment on Plaintiff's race discrimination claim.

Turning to his claim for hostile work environment, Plaintiff argues that Carter began to treat him differently after he opposed Carter's "unfair treatment," though Plaintiff does not explain further what he means by "unfair treatment." (Pl.'s Resp. in Opp'n 15, ECF No. 59.) Plaintiff again relies on evidence of Carter calling him a "troublemaker" and warning Leslie Morgan-Cox to avoid Plaintiff. Plaintiff contends that this evidence shows Carter created a

hostile work environment. As for his claim for retaliation, Plaintiff argues that he engaged in protected activity when he filed an internal EEO in December 2012 and then an EEOC charge in January 2013. Plaintiff asserts that Carter was aware of these charges and then failed to remove the December 2012 performance reminder from Plaintiff's personnel file. The performance reminder continued to be part of Plaintiff's personnel record beyond his termination and through the GFTP process. Plaintiff argues that taken together with the other circumstances surrounding his termination, the presence of the performance reminder in his personnel file somehow establishes a causal connection between his protected activity and his termination. Plaintiff then reiterates his arguments that Defendants did not have a legitimate, nondiscriminatory reason for his termination. Plaintiff adds that even if Patrick Elam believed that one of the managers he decided to terminate was white (he was actually Asian), Elam's belief is a fact issue for a jury. As a result, Defendants are not entitled to summary judgment as to Plaintiff's retaliation claim. Plaintiff concludes by opposing summary judgment on his claim for disparate impact[17] and request for punitive damages.[18]

Defendants have filed a reply brief. Defendants begin by objecting to the manner in which Plaintiff has responded to Defendants' statement of undisputed facts. According to Defendants, many of Plaintiff's response are actually non-responsive or consist of improper or inadmissible matters. Defendants further object to paragraphs 6 and 7 of Plaintiff's summary judgment affidavit, which Defendants contend contradicts Plaintiff's previous deposition testimony. Defendants then revisit many of the arguments they made in their opening brief,

[17] On this issue Plaintiff asserts that he has made out the claim because all of the managers fired with Plaintiff were minorities and that Elam's method of investigation constituted an employer policy or procedure.

[18] On this issue Plaintiff simply cites to the allegations of his pleadings and argues that punitive damages are an issue for trial.

including their contention that no direct evidence of discrimination exists in this case. Defendants argue that Plaintiff has the burden to establish the elements of his claims. As such, the Court should reject Plaintiff's argument that FedEx cannot explain why white employees were never disciplined for engaging in the same kind of timekeeping infractions Plaintiff committed. As for the HR compliance report, Defendants argue that HR's role was to review Plaintiff's termination and not decide whether Defendant had discriminated against Plaintiff on the basis of his race. Defendants contend that the Court need not decide whether the investigation was sufficiently thorough; the Court must only decide whether Elam had an honest belief that Plaintiff had violated company policy. And concerning Plaintiff's single reference to a cat's paw theory, Plaintiff has no proof that Carter influenced Elam's decision in any way.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[19] The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide."[20] In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party,[21] and the "judge may not make credibility determinations or weigh the evidence."[22] When the motion is supported by documentary proof such as depositions and

---

[19] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[20] *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009).

[21] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[22] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[23]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[24]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[25]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[26]

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[27]  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[28]

## ANALYSIS

### I. Statute of Limitations Under Plaintiff's Employment Agreement

Defendants first seek judgment as a matter of law on Plaintiff's § 1981 claims arguing that the six-month statute of limitations provided in Plaintiff's original employment agreement

---

[23] *Celotex*, 477 U.S. at 324.

[24] *Matsushita*, 475 U.S. at 586.

[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[26] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[27] *Anderson*, 477 U.S. at 251–52.

[28] *Celotex*, 477 U.S. at 322.

bars the claims. "[A] provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period."[29] The Sixth Circuit had held that six-month statute of limitations clauses in employment applications and contracts are enforceable.[30] Tennessee courts have, likewise, enforced employment contracts providing for a six-month statute of limitations.[31] In this case, it is undisputed that Plaintiff's application employment with FedEx stated that if Plaintiff brought legal action against FedEx, he must file suit "within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first."[32] In this suit it is undisputed that FedEx terminated Plaintiff on May 22, 2013.[33] Plaintiff filed his initial Complaint alleging his § 1981 claims on July 1, 2014. Even if the Plaintiff's cause of action accrued and the six-month statute of limitations period commenced on the date of the final decision of the FedEx Appeals Board to uphold his termination, Plaintiff received notice of the decision to uphold his termination on September 17, 2013. Therefore, the Court holds that Plaintiff's § 1981 claims against FedEx are time-barred.[34]

---

[29] *Order of United Commercial Travelers of Am. v. Wolfe,* 331 U.S. 586, 608 (1947).

[30] *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 357 (6th Cir. 2004).

[31] *Skaan v. Fed. Exp. Corp.*, No. W2011-01807-COA-R3CV, 2012 WL 6212891, at *9 (Tenn. Ct. App. Dec. 13, 2012).

[32] Empl. Agr., ECF No. 51-4.

[33] Pl.'s Statement of Add'l Fact ¶ 7.

[34] Plaintiff's argument that the contract lacked consideration is without merit. Another member of this Court considered and rejected the same argument, and the undersigned finds no reason to disagree with that decision. *Ray v. Fedex Corporate Servs., Inc.*, 668 F. Supp. 2d 1063, 1067 (W.D. Tenn. 2009) (McCalla, C.J.).

Defendants further argue that Plaintiff's employment agreement precludes his § 1981 claims against Carter and Elam. The Court declines to reach this issue because the Court holds that even if the employment agreement's six-month statute of limitations does not bar Plaintiff's claims against the individual Defendants, both Carter and Elam would still be entitled to judgment as a matter of law. The Court now considers the merits of Plaintiff's discrimination claims.

## II. Race Discrimination

Title VII states that it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of [his] race, color, religion, sex, or national origin."[35] Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[36] Courts evaluate § 1981 claims of discrimination under the same analytical framework and federal case law that apply to claims brought pursuant to Title VII.[37] Thus, the Court's "analysis and conclusions concerning the Title VII claims apply equally to parallel claims brought under" section 1981.[38]

"[A] plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."[39] "Direct

---

[35] 42 U.S.C. § 2000e−2(a)(1).

[36] *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006) (other citations omitted).

[37] *Jackson v. Bd. of Educ. of Memphis City Sch. of Memphis, Tenn.*, 494 F. Appx' 539, 2012 WL 3326305, at *4 n.1 (6th Cir. 2012) (citation omitted); Tenn. Code Ann. § 4-21-311(e) (codifying *McDonnell Douglas* burden shifting framework in THRA cases).

[38] *Jackson*, 494 F. App'x 539, at *4 n.1.

[39] *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003).

evidence proves the existence of a fact without requiring any inferences."[40] "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."[41]  In this case Plaintiff claims that he has direct evidence of discriminatory animus, namely that Carter became frustrated when dealing with his African-American subordinates and called Plaintiff a "troublemaker."  Plaintiff has cited no authority holding that evidence of this kind constitutes direct evidence of race discrimination, and the Court holds that this proof is not direct evidence of discrimination.  Therefore, Plaintiff's claim is based strictly on circumstantial evidence.

"Circumstantial evidence . . .  is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."[42]  Where as here a plaintiff offers only circumstantial evidence of unlawful discrimination, the Court analyzes the case using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[43]  Plaintiff bears the initial burden to establish his prima facie case of discrimination by showing that (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was treated differently than similarly situated non-protected employees.[44]

---

[40] *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 330 (6th Cir. 2012) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)) (ellipsis omitted).

[41] *Id.*; *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

[42] *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).

[43] *Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir. 2013) (citation omitted).

[44] *Id.* Plaintiff can also make his prima face showing with proof that he was replaced by a person outside of the protected class.  *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008).  However, Plaintiff has not raised this issue or cited any proof to make the showing at summary judgment.

"Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual."[45]

Only the fourth element of Plaintiff's race discrimination claim, that he was treated differently than similarly situated non-protected employees, is actually in dispute. The Sixth Circuit has held that in order to make this showing, a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment."[46] Rather Plaintiff's burden is to show that the plaintiff and the comparator are similarly situated in "all relevant respects."[47] In the context of disparate disciplinary treatment, the Sixth Circuit has explained that "the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'"[48] As part of its analysis of this element, the Court must examine "certain factors, such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."[49]

The Court holds that Plaintiff has failed to show that he and any other non-protected employee "engaged in the same conduct" or in acts of "comparable seriousness." Plaintiff was terminated for entering an exception into FedEx's NETtime system, showing that six tardy

---

[45] *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

[46] *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916–17 (6th Cir. 2013) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998)).

[47] *Id.* at 917 (citations omitted).

[48] *Id.* (citation omitted).

[49] *Id.* (citation omitted).

employees were actually at work on time. It is undisputed that Plaintiff did not know the six employees and that the six employees were not among the three employees Plaintiff had picked up at a screening stop leading into the Hub on April 28, 2013. Plaintiff has not cited any evidence to show that another operations manager engaged in conduct of the same kind but did not receive discipline. Instead Plaintiff argues that Ricky Carter had authorized operations managers to enter exceptions into the NETtime system for employees who were working overtime or a sixth shift during a given week to assist management with a manpower shortage in that area. Even viewing this proof in the light most favorable to Plaintiff, Plaintiff has not shown that any of the six employees whom he counted as on-time actually fit into this category.[50]

Plaintiff does assert in a summary judgment affidavit that "at no time did I ever handle net time in any manner differently from the way similarly situated White managers handled the system."[51] Plaintiff's statement amounts to the kind of vague, conclusory assertion that will not suffice to overcome a well-supported Rule 56 motion. The Sixth Circuit has held that broad accusations about non-protected employees generally receiving more favorable treatment do not carry a plaintiff's burden as to this element.[52] Moreover, the Sixth Circuit has repeatedly held that in order to make a prima facie case of disparate discipline, a plaintiff must show he was treated differently than similarly situated non-protected employees, specifically that the plaintiff

---

[50] This includes Kristi Flowers, Brian Forehand, and Joseph Morris, III, three white employees identified as possible comparators in Plaintiff's First Supplement to his Answers to Defendants' Second Set of Interrogatories (ECF No. 60-45). Plaintiff has not even attempted to show how these specific comparators were similarly situated to him in all relevant respects. In fact, Plaintiff does not even mention Forehand or Morris in his summary judgment briefing at all.

[51] Johnson Aff. ¶ 7 (ECF No. 59-2).

[52] *McNeil v. Sonoco Prods. Co.*, 519 F. App'x 382, 384 (6th Cir. 2013) (holding that the plaintiff failed to make out his race discrimination claim where he offered "only vague, conclusory statements that unnamed white employees 'are allowed to clock in late, if at all,' and are 'not written-up for every little infraction like blacks are'").

and his comparator committed acts of "comparable seriousness."[53]  Plaintiff also argues that FedEx cannot explain why no white managers were ever disciplined for entering exceptions into the NETtime system for tardy employees.  At summary judgment, though, it is Plaintiff's, and not FedEx's, burden to show that relevant comparator employees "engaged in the same conduct" but received more favorable treatment.  For these reasons, the Court holds that Plaintiff cannot prove his race discrimination claim.

Even assuming that Plaintiff could make out his prima facie case as to this claim, Defendants have satisfied their burden of production to give a legitimate, nondiscriminatory reason for Plaintiff's termination.  Generally, the violation of many kinds of workplace policies and procedures constitutes a legitimate, nondiscriminatory reason for discipline.  The Sixth Circuit has held that violating company policy about employee timekeeping constitutes a legitimate, nondiscriminatory reason for disciplining an employee.[54]  Plaintiff attacks the credibility of Defendants' proffered reasons, arguing that FedEx cannot explain why it disciplined only minority managers for violating the NETtime policy.  However, Defendants' "burden is one of production, not persuasion; it can involve no credibility assessment."[55]  Plaintiff's argument amounts to a claim that Defendants' reason for his termination lack credibility.  That argument is better aimed at the final stage of the burden-shifting analysis.

The burden now shifts back to Plaintiff to demonstrate by a preponderance of the evidence that Defendants' reasons are pretext for discrimination.  Plaintiff can make this

---

[53] *E.g. Martinez*, 703 F.3d at 917; *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 287 (6th Cir. 2012); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

[54] *Bilak-Thompson v. Dollar Tree Stores, Inc.*, 293 F. App'x 380, 385 (6th Cir. 2008) (holding that a manager's failure "to obtain the proper documentation before editing the time records of her store associates" was a legitimate, nondiscriminatory reason for termination).

[55] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

showing by proving one of the following: (1) Defendants' proffered reason has no basis in fact, (2) Defendants' proffered reason did not actually motivate the decision to terminate Plaintiff, or (3) Defendants' proffered reason was insufficient to motivate its decision.[56] Put another way, Plaintiff's burden "is to produce sufficient evidence from which a jury may reasonably reject the employer's explanation" and infer discrimination.[57] Even then summary judgment for the defendant may be appropriate "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."[58]

The Court holds that Plaintiff has not carried his burden to show that Defendants' legitimate reason for his termination was pretext. Plaintiff has essentially argued that any purported violation of FedEx's tardiness and punctuality policies could not have motivated Defendants' decision to discipline him because other managers engaged in the same kind of conduct. Here Plaintiff relies principally on the HR compliance report compiled during the GFTP process. It is true that the HR report questioned the justification for Plaintiff's termination in light of reports about other managers commonly entering exceptions in the NETtime system. However, the HR compliance report actually confirms that Plaintiff changed the time records for six employees on April 28, 2013. Perhaps more importantly, the HR compliance report does not

---

[56] *Martinez*, 703 F.3d at 915.

[57] *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

[58] *Griffin v. Finkbeiner*, 689 F.3d 584, 593-94 (6th Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

show that any other manager engaged in substantially similar conduct as Plaintiff. The report contains no information to show that other managers altered time entries for Hub employees without actually knowing why the employees were late to work. And the report does not address the fact that Plaintiff changed the start times in NETtime for six employees without verifying whether they were among the three employees he picked up at the screening station earlier in the day. Therefore, the HR compliance report does not show that Defendants' reasons for terminating Plaintiff were pretext for discrimination.

Plaintiff also cites the HR compliance report to question the thoroughness of the investigation into his case. Plaintiff argues that management should have investigated the case further by interviewing witnesses or conducting broader audits of the entries in the NETtime system. Even accepting these claims as true, however, Defendants have argued that management held an honest belief in its findings. "Even when a plaintiff has demonstrated an issue of fact regarding the validity of the factual basis underlying his termination, an employer may still defeat an inference of pretext if it can demonstrate that it held an honest belief in its reasons for taking the adverse action."[59] The Sixth Circuit's honest belief rule entitles an employer to "summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless."[60] An employer's investigation of misconduct "need not be perfect in order to pass muster under the rule."[61] In fact, the employer is not required to interview the employee or

---

[59] *Davis v. City of Clarksville*, 492 F. App'x 572, 580-81 (6th Cir. 2012) (citation omitted).

[60] *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590-91 (6th Cir. 2014) (quoting *Chen v. Dow Chem. Co.,* 580 F.3d 394, 401 (6th Cir. 2009)).

[61] *Id.* at 591 (citation omitted).

some or all of his witnesses.[62] "The key inquiry is instead whether the employer made a reasonably informed and considered decision before taking an adverse employment action."[63] In order to rebut the employer's reliance on the rule, the plaintiff must come forward with proof of "an error on the part of the employer that is too obvious to be unintentional."[64] The Court holds that Defendants have established the decision to terminate Plaintiff was "reasonably informed and considered" despite any defects Plaintiff can now identify in the investigation, and Plaintiff has not shown that the investigation or the GFTP process suffered from such gross errors as to be intentional.

In the final analysis, the HR compliance report perhaps casts doubt on the wisdom of terminating Plaintiff's employment for violating the specific policy at issue. "Employers are entitled to greater flexibility in management-level employment decisions, and [the federal courts] do not act as a super personnel department, overseeing and second guessing employers' business decisions."[65] The question for the Court is not whether FedEx was justified in terminating Plaintiff but whether Plaintiff has proof that FedEx terminated him in violation of federal anti-discrimination laws. The HR compliance report has little bearing on that issue and fails to create a genuine issue of material fact as to whether FedEx's decision was pretextual.

Plaintiff's arguments focusing on Ricky Carter's role in his termination also fail to establish pretext. According to Plaintiff, the proof shows that Carter had difficulty dealing with African-American managers working under his supervision and that Carter had commented to

---

[62] *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012).

[63] *Loyd*, 766 F.3d at 591.

[64] *Id.*

[65] *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (citations omitted).

his assistant that Patrick Elam would "straighten out" these managers. Plaintiff then cites a rumor that Elam was sent in to the second floor of the SPSS specifically to root out employees like Plaintiff. Plaintiff has only conjecture and speculation to support his conspiracy theory about Carter's role in his termination and Elam's part in the plot to remove him. "[S]peculative rumors on their own are insufficient to show a genuine issue of material fact to survive summary judgment."[66] Plaintiff does argue that Elam (and other African-Americans ratifying Plaintiff's termination as part of the GFTP process) acted as a cat's paw to carry out Carter's desire to terminate Plaintiff.[67] "In a traditional cat's paw case, a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker [the cat or cat's paw] as a dupe in a deliberate scheme to trigger a discriminatory employment action."[68] Fatal to Plaintiff's argument is the lack of proof showing that Carter influenced the decision to terminate Plaintiff's employment. In the absence of proof showing that Defendants' legitimate reasons for terminating Plaintiff were pretextual, Defendants are entitled to judgment as a matter of law. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's claim for race discrimination.

## III. Hostile Work Environment

---

[66] *Pearce v. Faurecia Exhaust Sys., Inc.*, 529 F. App'x 454, 458 (6th Cir. 2013).

[67] The Sixth Circuit has not precisely addressed "whether and to what extent cat's paw liability fits into the *McDonnell Douglas* framework." *Seoane–Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 n. 3 (6th Cir. 2014). Instead the Court of Appeals has "analyzed the *McDonnell Douglas* steps and the cat's paw elements separately." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347–53 (6th Cir. 2012). In this case Plaintiff has raised the cat's paw issue as an argument at the pretext stage of the *McDonnell Douglas* framework. Therefore, the Court considers the issue here.

[68] *DeNoma v. Hamilton Cnty. Court of Common Pleas*, No. 14-4058, 2015 WL 5332486, at *4 (6th Cir. Sept. 14, 2015) (quoting *Thrash v. Miami Univ.*, 549 F. App'x 511, 522 (6th Cir. 2014) (internal quotation marks omitted)).

Next, Defendants seek summary judgment on Plaintiff's claim for hostile work environment. Title VII prohibits discrimination that is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment."[69] In order to establish a *prima facie* case of hostile work environment based on race, a plaintiff must demonstrate the following elements: (1) that he is a member of a protected class; (2) that he was subjected to harassment, either through words or actions, based on his race; (3) that the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (5) there exists some basis for liability on the part of the employer.[70] The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."[71] Conduct that is "merely offensive" is insufficient to support a hostile work environment claim.[72]

The Court must look at the totality of the circumstances to analyze whether the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.[73] Appropriate factors to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

[69] *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

[70] *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) (citation and quotation marks omitted)).

[71] *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998).

[72] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).

[73] *Clay*, 501 F.3d at 707 (citation and quotation makes omitted).

with an employee's work performance."[74]  "Isolated incidents. . . , unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment."[75] Furthermore, only incidents that occurred because of a plaintiff's protected status are properly considered in the context of a claim of hostile work environment.[76]

The Court holds that Plaintiff has not shown under the totality of the circumstances that he was subjected to a hostile work environment.  Plaintiff bases his claim on some of the same evidence already discussed in the Court's analysis of Plaintiff's other claims, including Carter calling Plaintiff a "troublemaker" and later warning Leslie Morgan-Cox to dissociate herself from Plaintiff.  Even viewing the proof in the light most favorable to Plaintiff, the Court holds that none of these incidents had the effect of unreasonably interfering with Plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment. The single incident of Carter calling him a troublemaker amounts only to an isolated offensive utterance.[77]  More importantly, Plaintiff has not shown that Carter called him a troublemaker because of Plaintiff's race.  And the other treatment Plaintiff found unwelcome does not amount to "harassment," and even if it did, Plaintiff has not shown that Carter treated him differently because of his race or did so with any frequency.[78]  The Court concludes that Plaintiff cannot

---

[74] *Id.* (quoting *Harris,* 510 U.S. at 23).

[75] *Bowman v. Shawnee St. Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

[76] *Howard v. Bd. of Educ. of Memphis City Schs.*, 70 F. App'x 272, 282 (6th Cir. 2003).
[77] *Clay*, 501 F.3d at 706 ("[T]he incidents complained of amounted to 'mere offensive utterances,' which are not actionable under Title VII.") (citation omitted).
[78] The same must be said of Stuart Massey's single email to Plaintiff or his terse response to Plaintiff over the telephone.  The incidents were sporadic and fail to show that Massey treated Plaintiff differently because of his race.  *Weatherby v. Fed. Exp.*, 454 F. App'x 480, 492-93 (6th Cir. 2012) ("The infrequency of the uncomfortable or unwelcomed incidents experienced by Plaintiff . . . do not rise to the level required to sustain a hostile work environment claim at the summary judgment stage.").

establish his hostile work environment. Therefore, Defendants' Motion is **GRANTED** as to this claim.

## IV. Retaliation

Defendants also seek summary judgment on Plaintiff's claim for retaliation. In order to make out his *prima facie* case of retaliation, Plaintiff must demonstrate the following: (1) that he engaged in protected conduct; (2) that Defendants had knowledge of his protected activity; (3) that Defendants took an adverse employment action against him; and (4) that there was a causal connection between the protected activity and the adverse employment action.[79] A Title VII retaliation claim "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[80] The Court holds that Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

The Court will assume that the first element, Plaintiff's protected activity, is satisfied in this case. Plaintiff filed an internal EEO in December 2012 and a charge with the EEOC in January 2013. Notably, Plaintiff raised a claim of age discrimination in his EEOC charge and not race discrimination as he does in this suit. Plaintiff also cites two materially adverse actions taken against him by Defendants: his termination in May 2013 and the failure to remove a written performance reminder from his personnel file. Concerning his termination, the Court holds that Plaintiff has not shown that the relevant decision-maker, Patrick Elam, knew about his prior protected activity. The Sixth Circuit has held that "[t]he decisionmaker's knowledge of the

---

[79] *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).

[80] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

protected activity is an essential element of the prima facie case of unlawful retaliation."[81]  Elam made the decision to terminate Plaintiff following his investigation into Plaintiff's use of the NETtime system.   However, Plaintiff has no proof that Elam knew about Plaintiff's prior protected activity.  The Court concludes then that Defendants are entitled to summary judgment on Plaintiff's retaliation claim stemming from his termination.

Plaintiff has also alleged that Carter failed to remove written discipline from Plaintiff's personnel file.  It is not clear to the Court whether Plaintiff alleges that the presence of the written discipline in his personnel file was a factor in his termination or whether Plaintiff believes the failure to remove the written discipline was in and of itself an adverse action taken in retaliation for his protected activity.  Although his argument is not entirely clear on this point, the Court finds that Plaintiff's theory suffers from a number of problems.  First, Carter issued Plaintiff a written performance reminder in December 2012, and Plaintiff prevailed in his appeal of Carter's decision through the GFTP process.  Plaintiff contends in his statement of additional facts that following his successful appeal of Carter's written discipline, "FedEx was supposed to remove the write-up" from Plaintiff's personnel record.[82]     In his brief, however, Plaintiff also argues that Carter and Tina Adams had responsibility for removing the write-up from his personnel record.  Defendants have adduced evidence that the HR department would have had the duty to set the personnel record straight.  For his part, Plaintiff has not cited any evidence to support his claim that either Carter or Adams should have gone back to remove the written discipline.  As such, any claim that Plaintiff's challenge to Carter's disciplinary decision was the "but for" cause of the failure to remove the written performance reminder from Plaintiff's

---

[81] *Frazier v. USF Holland, Inc.,* 250 F. App'x 142, 148 (6th Cir. 2007).

[82] Pl.'s Statement of Add'l Fact ¶ 21.

personnel record is unsubstantiated.

Furthermore, assuming without deciding that the performance reminder was an adverse employment action, Plaintiff has not shown how the failure to remove the performance reminder altered the terms of his employment or would have dissuaded a reasonable employee from exercising a protected right. It appears to be undisputed that the written performance reminder continued to be in Plaintiff's personnel record and that the personnel record was included in the packet for the Appeals Board at step 3 of the GFTP process. Even so, Plaintiff has no evidence that the single written performance reminder had any effect on the Board's ultimate decision to uphold his termination. Without this proof, Plaintiff cannot show that the write-up being left in his folder actually caused him any harm. Therefore, the Court holds that Plaintiff cannot make out a prima facie claim of retaliation.

Even if Plaintiff could make out his prima facie claim, the Court has already held that Defendants had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, and Plaintiff has not shown that Defendants' reason was pretext for discrimination. Therefore, Defendants' Motion for Summary Judgment is **GRANTED** as to this claim.

## V. Disparate Impact

Finally, Defendants seek judgment as a matter of law on Plaintiff's disparate impact claim. Disparate impact claims derive from the premise that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."[83] A plaintiff alleging disparate impact must show "that a specific employment practice or policy caused a significant disparate impact on a protected

---

[83] *Hawkins v. Memphis Light Gas & Water*, 520 F. App'x 316, 322 (6th Cir. 2013) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988)).

group," in this case, African-Americans.[84]  Once the plaintiff makes out a prima facie case, the burden shifts to the employer to show that its practice or policy is "job related" and "consistent with business necessity."[85]  If the employer carries its burden, the burden then shifts back to the plaintiff to show "that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs.[86]

Defendants argue at summary judgment that Elam's discretionary decision to review three days' worth of NETtime audit data cannot be considered an employment practice or policy. Otherwise, any disciplinary investigation that impacted only protected employees would always make out a disparate impact claim.  The Court agrees.  Plaintiff has failed to meet his burden "for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."[87]  In this case, Plaintiff was required to show that FedEx had adopted a policy or practice for investigating punctuality that resulted in a statistical disparity adversely affecting a protected group of employees.  Plaintiff has not proven such a case but instead cited the specific instance where a single investigation led to the dismissal of Plaintiff, two other African-American managers, and one Asian manager.  This will not suffice to constitute a "specific employment practice or policy."  And even if Elam's approach could be said to be a company policy or practice, Plaintiff has not come forward with statistics or statistical analysis to compare the number of African-American managers generally with the

---

[84] *Id.* (quoting *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)).

[85] *Johnson v. City of Memphis*, 770 F.3d 464, 471-72 (6th Cir. 2014) (citations omitted).

[86] *Id.*

[87] *Grant v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 446 F. App'x 737, 740 (6th Cir. 2011) (quoting *Watson*, 487 U.S. at 994)).

number of managers overall or the number of African-American managers who were disciplined for their misuse of the NETtime system with the overall number of managers who were disciplined for their misuse of the NETtime system. "Without evidence of the racial composition of the pool of [managers], a reasonable factfinder would be unable to determine whether bias motivated [Defendants'] decisions, or if the decisions were based on legitimate selection criteria or chance.[88] Therefore, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claim for disparate impact, and their Motion is **GRANTED** as to this issue.

## CONCLUSION

Defendants' Motion for Summary Judgment is **GRANTED** as to all of Plaintiff's claims for relief. Having dismissed Plaintiff's claims on the merits, the Court need not reach the issue of whether Plaintiff would have been entitled to punitive damages against Defendants.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: October 14, 2015.

---

[88] *Hawkins*, 520 F. App'x at 322.